J-A29020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: G.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: C.M.K., MOTHER | No. 1350 EDA 2017 |

Appeal from the Order and Decree Entered March 30, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No.: CP-51-DP-0001734-2016

BEFORE: LAZARUS, J., PLATT, J.,* and STRASSBURGER, J.*

MEMORANDUM BY PLATT, J.:                    **FILED OCTOBER 10, 2018**

C.M.K. (Mother) appeals from the order and decree of the Court of Common Pleas of Philadelphia County, entered March 30, 2017, that together terminated dependency court supervision of her son of G.K. (Child) (born 9/07) and awarded permanent legal and physical custody of Child to M.K. (Maternal Grandmother). We affirm on the basis of the trial court opinion.

We originally analyzed this matter in a memorandum entered in this Court on December 8, 2017. In that memorandum, we determined that the trial court had erred when it awarded permanent legal and physical custody of Child to Maternal Grandmother without having expressly considered the

_____

* Retired Senior Judge assigned to the Superior Court.

sixteen custody factors enumerated in 23 Pa.C.S.A. § 5328(a) on the record, either in open court or in its written opinion. Accordingly, we remanded this matter to the trial court with instructions to submit an opinion to this Court, within thirty days, in which it discussed each of those factors. We also ordered that the trial court's order and decree were to remain in effect pending the trial court's response to our remand order.

In an opinion entered on December 14, 2017, the trial court considered each of the sixteen custody factors and again concluded that Child's best interests would be served by awarding permanent legal and physical custody to Maternal Grandmother. We now affirm the trial court's order and decree.

The record before us supports the following recitation of the facts of this case. On August 11, 2016, Philadelphia's Department of Human Services (DHS) received a general protective services report (GPS) that alleged that Child had been left unattended in a hot car in a Wal-Mart parking lot. Two days later, on August 13, 2016, DHS received an additional report that Child had made allegations of physical abuse as to Mother and allegations of both physical and sexual abuse as to Mother's husband, (not Child's father), who resided with Mother. The report further alleged that Child had been found walking alone in the street with a dog and cat asking strangers how to get home to Florida.

DHS obtained an order of protective custody (OPC) for Child on August 14, 2016. On that same day, DHS took Child for a forensic interview at

Philadelphia Children's Alliance (PCA) because of the allegations of physical and sexual abuse. DHS also took him to St. Christopher's Hospital for Children to receive medical attention for abrasions on his legs and knees. When asked whether any family resources were available to serve as a kinship placement resource for Child, Mother mentioned Child had a maternal great-aunt in Pennsylvania, but she lived two hours away. Child reported to the DHS investigator that he wanted to return to Florida to live with Maternal Grandmother. DHS made contact with Maternal Grandmother, who traveled from Florida to Philadelphia to serve as a placement resource for Child. Mother told DHS she would prefer that Child be placed in general foster care rather than with either of the two available kinship resources because she believed Maternal Grandmother had coached Child to make false allegations against her. Child was placed in general foster care on August 14, 2016.

At a shelter care hearing on August 17, 2016, the trial court ordered Child to remain temporarily committed to DHS and placed in his foster home pending further investigation. Both Mother and Maternal Grandmother appeared at this hearing. Mother was not to have any visitation until further order of the court. The order further noted that Maternal Grandmother had expressed an interest in caring for Child.

The trial court adjudicated Child dependent on September 7, 2016, by the agreement of all parties that Mother was presently unable to provide Child with the proper care necessary for his physical, mental or emotional health.

N.T. 9/7/2016.[1]  Mother and Maternal Grandmother were offered supervised visits, and DHS was ordered concurrently to plan for Child to be placed with Maternal Grandmother in Florida via the procedures set forth in The Interstate Compact on the Placement of Children (ICPC).

Maternal Grandmother filed a petition for custody in Florida on August 18, 2016.  She remained in Philadelphia to support Child and seek to have Child transferred from general foster care to a kinship placement with Maternal Great-Aunt, who resided in Hanover, Pennsylvania.  Maternal Great-Aunt had appeared at the adjudicatory hearing and at several subsequent hearings as a ready and willing kinship resource.  Maternal Grandmother also filed an emergency petition for special relief in the dependency matter in Philadelphia on October 6, 2016, requesting an emergency hearing to argue that she should be granted custody of Child and that he be immediately removed from general foster care.  The trial court scheduled a hearing on the petition for October 19, 2016.

At the October 19, 2016 hearing, Maternal Grandmother's counsel argued that Child should be placed with Maternal Great-Aunt in Hanover,

---

[1]  Child was adjudicated dependent based on the agreement of all parties. N.T. 9/7/2016 at 8-9.  Counsel for DHS stated, "Your Honor, the parties have come to an agreement on the petition that we filed . . . and that is to adjudicate dependent based on present inability with a full commit to DHS." *Id*.  Counsel for DHS then presented the agreed upon recommendations and provided an offer of proof as to what the testimony of the DHS investigator would reflect, if called.  No party objected during the proceeding.

Pennsylvania, if the trial court would not grant Maternal Grandmother immediate custody. The Child Advocate joined in the request. DHS and Mother objected, arguing that the move would disrupt reunification attempts. The trial court ordered this option explored, and granted Maternal Grandmother's motion to intervene in the dependency matter stating, "The grandmother is given status to intervene on this case based upon the in loco parentis status that she has with [Child]." N.T. 10/19/16 at 16.

For a variety of reasons, including the contested state of the matter, the case was continued on November 2, 2016, November 16, 2016, and, December 6, 2016. On December 8, 2016, DHS presented testimony, but time constraints resulted in a continuance, and there was no final determination regarding case disposition and the contested issue of placement.

Child moved into a different foster home on an emergency basis in late December of 2016, after he presented at a visit with unexplained facial bruising, in addition to pre-existing concerns of inadequate supervision and allegations that Child was the victim of bullying by an older youth in the home.

Child had not had any reported behavioral or academic issues in Florida, but began failing all classes, frequently absconding from school, stealing, and breaking into his former foster home. He also burned his new foster brother with a clothing iron and subsequently tried to burn down his new foster home.

On March 2, 2017, the trial court held a Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) telephone conference during a permanency review hearing. All parties were represented at the conference with the Tenth Judicial Circuit for Highlands County, Florida. After extensive discussion, all parties agreed that Florida would not exercise jurisdiction over the case and the trial court would exercise jurisdiction pursuant to the UCCJEA to preside over the issues of custody and dependency. The trial court accepted jurisdiction and advised all parties that the custody matter would be entertained at the next hearing.

After the UCCJEA conference, Child testified that he wanted to return to the care of Maternal Grandmother, that he did not like the school he was attending, that he was getting in fights, and would not "feel good" if the judge decided he should live with his mother. N.T. 3/02/17 at 44-48. He testified, "I don't like living with my mother." N.T. 3/02/2017 at 44. He was scared of returning to Mother's home because her husband was doing "bad stuff," including, "hitting me," and, "touching me in a bad way." N.T. 3/02/2017 at 47. He clarified for the court that he calls Maternal Grandmother, "Mom," and Mother by her first name. *Id*. The trial court found that it was in Child's best interest to be immediately removed from general foster care and placed with Maternal Great-Aunt, and awarded her temporary legal custody pending determination of the custody matter at the next hearing. The trial court reminded all parties that it would entertain the issue of custody at the next

hearing, and twice highlighted to all parties that counsel would not be appointed given that this would become a private custody matter after the anticipated discharge of the Dependency Petition.

The trial court discharged the dependency on March 30, 2017, excused the parties that were involved solely in the dependency proceeding and granted the Child Advocate's request to represent Child in the custody case. The trial court provided all parties with copies of the Florida petition and noted that jurisdiction had been properly conferred on the trial court based on the UCCJEA procedure allowing for such a transfer.

Maternal Grandmother was the first witness to testify in the custody proceeding. She testified that Child had been living with her and her husband since his birth in September of 2007. N.T. 3/30/2017 (N.T.) at 18. Although Mother initially resided in the home with Child, Maternal Grandmother explained that Mother moved out in January of 2008, leaving Child in her care. *Id*. Maternal Grandmother testified that, since that time, she and her husband had, until the events of the past year, created a stable life for Child in Florida, where Child was locally known as a baseball "all-star" and thrived socially, academically, and athletically. N.T. at 18, 25-35.

Maternal Grandmother testified that she and her husband have provided the caretaking duties for Child throughout his life, including, but not limited to ensuring that they met his school, medical, emotional, and other needs. N.T. at 25-26. She described a typical day for Child while in her care in Florida and

emphasized his passion for baseball. N.T. at 28-29. Maternal Grandmother testified that Child's teachers, baseball coaches, and friends regard Maternal Grandmother and her husband as Child's primary "parental" resources. N.T. at 29, 31. Maternal Grandmother echoed Child's testimony from the March 2, 2017, hearing that Child refers to her as, "Mom" and to Mother as, "[first name]." N.T. at 24.

Maternal Grandmother supported her testimony regarding her parental role with a notarized affidavit executed July 6, 2010, between Maternal Grandmother and Mother that formalized their mutual agreement, at that time, that Maternal Grandmother would have legal and physical custody of Child, along with full authority over making any and all of his medical and educational decisions. N.T. at 38-39. Mother objected to the entry of this affidavit stating, "The purpose of that document is because I had a warrant out for my arrest and I knew I was going to be incarcerated for about three months." N.T. at 40. After Mother confirmed that she had signed the document, the trial court overruled her objection and admitted the affidavit. N.T. at 41. Maternal Grandmother testified that the rights conferred to her in the affidavit had never been revoked. N.T. at 39.

In explaining how the events leading to Child's adjudication began, Maternal Grandmother testified that on July 6, 2016, Mother showed up at her house and stated that she was taking Child to Philadelphia for a few weeks, but promised to return him in time for school in early August. N.T. at 23.

Describing her relationship with Child as compared to Mother's relationship with him, Maternal Grandmother testified, "[Child] only knows my husband and I [sic] as his parents. My daughter, when she -- she lives in the same town we do, a small community, when she has come over, she doesn't make a real effort to interact with him. It's more like a sister brother relationship." N.T. at 53.

Maternal Grandmother further testified that she had recently spoken to Child, who had expressed his continuing desire to return with her to Florida. N.T. at 61. She stated that Child was afraid of returning to Mother's care and that she was aware of the fact that Child had recently been refusing his visits with Mother. N.T. at 61. Maternal Grandmother indicated her eagerness to again be able to provide a stable, safe, consistent life for Child, explaining, "I have been doing it from the day he was born . . . we would always be there to take care of him." N.T. at 34. Maternal Grandmother emphasized that Child had no family support or community ties to Philadelphia besides Mother. N.T. at 33. On the other hand, he has relationships with a variety of extended family members, friends, and baseball coaches, and teachers in Florida. N.T. at 24, 28, 30.

Describing Child's life in Florida with her, Maternal Grandmother emphasized that, "baseball is his passion." N.T. at 28. Maternal Grandmother and her husband support this passion by enabling him to play ten months out of the year, registering him with a travel team, paying for all of his equipment

and associated fees, and attending his games. N.T. at 28-29. On the other hand, she testified that Mother had never helped defray these costs or supported or encouraged Child's love of baseball in any capacity. N.T. at 30. Despite frequently being within ten miles of the field where Child often played and practiced, Mother never attended any of Child's games. N.T. at 29. During cross-examination by Mother, Maternal Grandmother acknowledged that Mother attended one of Child's practice sessions with her step-children and husband but never attended any of his games. N.T. at 57.

Marni Stone, Child's child advocate social worker, testified that she had formed a close relationship with Child in the months since the case opened through frequent contact via visits and telephone. N.T. at 66. Ms. Stone testified that Child had expressed on numerous occasions his desire to go back to Florida and live with Maternal Grandmother. N.T. at 67. In fact, she noted that Child recently confided in her that, if he were placed with Mother and not Maternal Grandmother, he would run away again. *Id*. Ms. Stone opined that it would be in Child's best interest to return to Florida to live with Maternal Grandmother, the person he views as his mother. *Id*. Finally, Ms. Stone presented a letter, dated February 28, 2017, written by Child, in which he explained that he was scared to go back to Mother and clearly stating his

preference, "all I want to do is go back home with mommy who is my grand mom." Dependency Record 35, Child Advocate Exhibit 1; N.T. at 70. [2]

Kharyee Connors, Child's Community Umbrella Agency (CUA) case manager, testified that Child had expressed a desire to live with Maternal Grandmother. N.T. at 81.

During her testimony, Mother admitted, "[Child] loves his grand mom. There's no denying that." N.T. at 87. She stated that the allegations of sexual

_____

[2] In **In re Adoption of L.B.M.**, ____ Pa. ____, 161 A.3d 172 (2017), our Supreme Court addressed "whether 23 Pa.C.S. § 2313(a), which mandates the appointment of counsel for children involved in contested involuntary termination of parental rights ("TPR") proceedings, is satisfied by the appointment of a guardian *ad litem* ("GAL") provided that the GAL is an attorney." **L.B.M.**, **supra** ____ Pa. , 161 A.3d at 174. At the time of the proceedings at issue in the instant appeal, the holding in **L.B.M.** had not been extended beyond TPR proceedings; however, while this appeal was pending, this Court extended the requirements of **L.B.M.** and its progeny to dependency actions generally. **See In re J'K.M.**, **supra**, (reversing order denying appointment of a separate counsel for dependency proceedings where there was a conflict between the child's best interests and legal interests). Moreover, our Supreme Court re-visited **L.B.M.** In **In re T.S.**, 2018 Pa. LEXIS 4374 (filed August 22, 2018), ____ Pa. ____ ,____ A.3d ____ (2018), the Supreme Court held that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. The Court explained, "if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings." **Id.** at ____, 2018 Pa. LEXIS 4374 at *27-28. In this case, the trial court appointed Attorney Angela Brosnan as Child's advocate and Child clearly expressed his desire to live with Maternal Grandmother. There was no conflict between his legal interests and his best interests.

- 11 -

and physical abuse first arose in 2009 and that she continues to have to endure similar allegations being made against her husband. N.T. at 86. She opined that all of the allegations have come from Maternal Grandmother and not Child, and that they are untrue. N.T. at 86. Mother stood by her testimony that Maternal Grandmother had coached Child to make false allegations through the years despite evidence that Child had stood by the truth of his allegations throughout the dependency proceeding, continuing to report them independently in, for example, his Psychological Evaluation. Dependency Record 30, Psychological Evaluation, 11-13.

Mother testified that she has a 'loving family" with her husband and that "there's nothing wrong in our household." N.T. at 102. When directly asked if there had been incidents of domestic abuse or physical or verbal abuse between her and her husband, Mother testified, "None at all." N.T. at 104. However, on cross-examination, Child's counsel produced reports from the Highland County Florida Sheriff's Office for domestic incidents that had occurred on January 14, 2015, July 2, 2015, June 6, 2013, December 11, 2011, and May 20, 2010. N.T. at 105-109. Mother conceded that the reports stated they pertained to incidents between herself and her husband. N.T. at 105-109.

Mother testified that she lived with Maternal Grandmother at the time that Child was born, and subsequently obtained her own apartment, but, after two months, returned to Maternal Grandmother's home and resided there until

she got married in 2011.  N.T. at 83.  She and her husband then moved to Philadelphia for approximately a month.  Mother, however, did not like Philadelphia so they returned to Florida and resided with her husband's sister. According to Mother, the family then relocated to their own apartment, where they resided for the next year.  Mother claimed that Child resided with her during this entire time.  N.T. at 83-4.  Mother stated that, in 2012, she and Maternal Grandmother agreed that Child would return to Maternal Grandmother's home, but, according to Mother, she was at Maternal Grandmother's home "every single day" up until the time that she took Child from Maternal Grandmother in 2016.  N.T. at 84-85.

On cross examination, Maternal Grandmother's counsel questioned Mother regarding her statement that she resided with her Maternal Grandmother until the time that she got married.  Mother confirmed that statement was correct.  N.T. at 96.  Counsel then proceeded to question Mother regarding eleven addresses in Florida and Pennsylvania that were connected with her name.  N.T. at 96-100.  When counsel suggested that it appeared that she had not had stable housing during Child's life, Mother responded that the statement was not correct as "I have had a roof over my head . . . ."  N.T. at 100.

Also, on cross-examination by Maternal Grandmother's counsel, Mother testified that she still believes Child was better off in foster care for the past seven months rather than with kin, in spite of everything he had endured.

According to Mother, if Child had been placed with Maternal Great-Aunt during the case, Maternal Great-Aunt would have manipulated Child in the same ways she alleged Maternal Grandmother manipulated him. N.T. at 103-104. Mother admitted that she had been involved with Children and Youth Services in both Florida and in Pennsylvania. N.T. at 110. She was unaware that Child had been diagnosed with adjustment disorder with mixed disturbance of emotion, conduct post-traumatic stress disorder, suspected victim of physical abuse, and suspected victim of sexual abuse, despite being present at past hearings where Child's psychological evaluation was discussed and entered into evidence. Dependency Record 30, Psychological Evaluation, 13.

On March 30, 2017, the trial court entered its order terminating court supervision of Child and its decree awarding permanent physical and legal custody of Child to Maternal Grandmother.

Mother filed her notice of appeal and concise statement of errors complained of on appeal on April 24, 2017.

Mother presents the following issues for our review:

1) Whether the [trial court] erred by granting standing to [M]aternal [G]randmother in the custody case where she did not have standing pursuant to Pennsylvania law to be a party to the dependency or custody proceeding before the [trial court] and [M]aternal grandmother did not file a petition for custody in Philadelphia County?

2) Whether the trial court erred when it discharged the dependency petition and awarded custody to [M]aternal [G]randmother where it did not properly weigh and place on the record the factors for determining custody pursuant to 23 Pa.C.S. §5328(a)?

3) Whether the trial court erred when it discharged the dependency petition and awarded custody to [M]aternal [G]rand mother where [Child] did not appear at the hearing to express his desires to the [trial] court?

4) Whether the trial court erred when it discharged the dependency petition and did not return [Child] to [M]other when she was ready, willing and able to care for [Child] and had no dependency issue in her house?

Mother's Brief, at 5.

Our scope and standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012).

We have stated,

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citing *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)).

We must accept the trial court's findings that are supported by competent evidence of record, and we defer to the trial court on issues of credibility and weight of the evidence. If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

Additionally,

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*S.M. v. J.M.*, 811 A.2d 621, 623 (Pa.Super. 2002) (quoting *Robinson v. Robinson*, 645 A.2d 836, 838 (Pa. 1994)).

The trial court has written a comprehensive opinion setting forth, in detail, the facts of this case and has ably applied our law to these facts to reach what clearly appears to be the correct disposition of this matter, the return of Child to his Maternal Grandmother's care in Florida.

One of the issues Mother raises, however, her claim that the trial court failed to consider each of the custody factors enumerated in 23 Pa.C.S.A. §5328(a), previously prevented us from considering the appeal at that time.

In ordering a custody modification, the trial court is required to consider sixteen factors set forth in 23 Pa.C.S.A. § 5328(a). Section 5328(a) provides:

> In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

After considering the sixteen custody factors enumerated in section 5328, a trial court may award one of several types of custody to a party. 23 Pa.C.S.A. §5323(a). Section 5323 mandates that, when the trial court awards custody, it "shall delineate the reasons for its decision **on the record in open court or in a written opinion or order.**" *Id*. §5323(d). (emphasis added). *C.B. v. J.B.*, *et al.* 65 A.3d 946, 951 (Pa. Super. 2013).

"**All** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super 2011) (emphasis in original). "When a trial court fails to

account for all of the required factors in reaching a custody determination, the trial court order should be vacated and the case remanded for consideration of the required factors and further fact-finding." *Id.* at 654.

We have examined the record in this matter and we find that it contains sufficient, credible evidence to permit the trial court to terminate Child's dependency and to award permanent legal and physical custody of Child to Maternal Grandmother.

We have also examined the trial court's opinion of December 14, 2017, and we find it to be a correct and comprehensive analysis of this matter. Accordingly, we affirm the trial court's order and decree entered March 30, 2017, that terminated Child's dependency and awarded permanent legal and physical custody of Child to Maternal Grandmother on the basis of the concise, thorough, and well-written opinion of the Honorable Allan L. Tereshko, Sr.

We direct that the parties shall attach the trial court opinion with all personal information redacted, including the child's birthdate, in the event of future proceedings.

Order and decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/10/18

- 19 -

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY**
**IN THE COURT OF COMMON PLEAS**

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-Dependency |
| | : CP-51-DP-0001734-2016 |
| G.K., Jr., a Minor | : |
| | : OC1700611 -CUSTODY |
| | : |
| APPEAL OF: | : Superior Court 1350 EDA 2017 |
| | : |
| C.M.K., Mother | : |

**OPINION**

**INTRODUCTION**

C.M.K., ("Mother"), Appeals from the Decree and Order entered by this Court on March 30, 2017, Terminating Dependency Court Supervision of her son G.K., (Child), born September 16, 2007, and awarding Permanent Legal and Physical Custody to Maternal Grandmother, M.K. In response to the Orders of March 30, 2017, Mother, by and through her counsel, filed a Notice of Appeal with Statement of Matters Complained of Upon Appeal on April 24, 2017.

On June 19, 2017, this Court submitted its Opinion pursuant to Pa.R.A.P., Rule 1925(a), Opinion in Support of Order. On December 8, 2017, the Superior Court of Pennsylvania Remanded this case with instructions to this Court to submit an Opinion, within thirty days, in which it discusses each of the custody factors listed in section 5328(a). This Opinion is in response to the Remand instructions.

1

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother avers the following:

1. The Court erred by granting standing to the maternal grandmother in the custody where she did not have standing pursuant to Pennsylvania law to be a party to the dependency or custody proceeding before the court and maternal grandmother did not file a petition for custody in Philadelphia County.

2. The trial Court erred when it discharged the dependency petition and awarded custody to maternal grandmother where it did not properly weigh and place on the record the factors for determining custody pursuant to 23 Pa.C.S.A. §5328(a).

3. The trial Court erred when it discharged the dependency petition and awarded custody to maternal grandmother where the child did not appear at the hearing to express his desires to the court.

4. The trial Court erred when it discharged the dependency petition and did not return the child to mother when she was ready, willing and able to care for her child and had no dependency issues in her house.

## PROCEDURAL HISTORY:

The Child, G.K., was born in Florida on September 16, 2007. After his birth, the Child was cared for by his Maternal Grandmother, M.K. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "b").

In July 2016, the Child's Mother, C.M.K., retrieved the Child from the home of Maternal Grandmother, M.K. and moved him to Philadelphia to live with her and her husband, the Child's stepfather, J.M. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "c").

2

On August 11, 2016, DHS received a General Protective Services (GPS) Report which alleged that at approximate 1:35 p.m. on August 11, 2016, nine-year-old G.K. and his siblings, four-year-old J.M., and seven-month-old, A.M., were observed unattended inside a car located in the parking lot of a Wal-Mart store at 2200 Wheatsheaf Lane. The Report alleged that the police were called to the scene; that the Children were sitting in the car with only the rear driver-side window open; and that Mother was inside the Wal-Mart shopping and exited the store minutes after the police arrived. The Report also alleged that the police observed a bruise on the Child's forehead and that the police permitted Mother to leave with the Children. It was further alleged that the family recently moved from Florida to Philadelphia; and that the family may have had Children and Youth involvement in Florida. The Report was under investigation. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "d").

On August 11, 2016, DHS received a Supplemental Report which stated that the Child had contacted his maternal grandmother, M.K., and stated that he and his siblings had been left inside of a car by Mother while she shopped at a Wal-Mart. The Report alleged that the Child was afraid; that he stated that he wanted to return to Florida; that his siblings were hitting him; and that his stepfather, J.M. had touched him in a sexually inappropriate manner. The Report alleged that the Child was born in Florida; that he had been cared for by M.K. since his birth; that while in Florida, he was doing well; and that the Child's behavior changed in June 2011, when Mother and her husband, J.M., temporarily resided in M.K.'s home and took the Child to Philadelphia. It was alleged that the family stayed in Philadelphia for two weeks; that thereafter, the Child was returned to Florida; and that the Child had made allegations that J.M. had touched him in

3

a sexually inappropriate manner during the time the family resided with M.K.; in addition to the family's two week visit to Philadelphia. It was further alleged that in July 2016, Mother and J.M. retrieved the Child from the home of M.K.; that the family moved to Philadelphia with the Child and his siblings; that Mother and J.M. collected welfare benefits for the Child; and that J.M. had a criminal history. The Report is under investigation. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "e").

On August 13, 2016, DHS received a GPA Report which alleged that the Child had left the family's home; that he was observed at 8th and Loudon Streets walking down the street with a dog and a cat; that the Child stopped to speak with other Children and asked how to get to Florida; that the police were contacted and the Child was interviewed; that it was alleged that the Child was the victim of physical abuse by Mother and stepfather, J.M.; and that the Child was the victim of sexual abuse by J.M., the stepfather. The Report alleged that the Child had abrasions on his legs and knees; that he was taken to St. Christopher's Hospital for Children to be examined; and that the Child would receive an emergency forensic interview at Philadelphia Children's Alliance (PCA). The Report also alleged that the Child previously resided in Sebring, Florida with his Maternal Grandmother, M.K.; that in June 2016, after he completed the school term, he moved to Philadelphia with his Mother and stepfather; and that his Maternal Grandmother, M.K., had attempted to file for custody of the Child in Florida. The Report is under investigation. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "f").

On August 13, 2016, DHS received a Child Protective Services (CPS) Report which alleged that the Child had bilateral abrasions to both of his knees; that it was alleged that Mother had been pushing the Child down flights of steps; that the Child

4

wanted to return to the care of Maternal Grandmother, M.K. in Sebring, Florida; that the Child had been in the care of M.K. since birth; and that the Child was enrolled in the Florida school system. The Report alleged that the Child had been living in Philadelphia since July 2016; and that the Child made allegations that J.M., his stepfather, had touched him inappropriately. The Report also alleged that M.K. planned to visit Philadelphia because she wanted the Child returned to her care; that the Child was examined at St. Christopher's Hospital for Children; that Mother and stepfather were present at the hospital and denied the allegations of sexual abuse; and that Mother stated that she had no resources in Philadelphia and no one who could care for the Child. The Report is under investigation. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "g").

On August 14, 2016, DHS received a Supplemental Report which alleged that stepfather had contacted DHS to inquire why he could not visit or retrieve the Child from St. Christopher's Hospital for Children; that he stated that his rights were being violated because no one had asked his permission; that at approximately 4:00 p.m. on August 13, 2016, the Child had told the stepfather that he was going outside to walk the family's dog and cat; that when the Child had not returned home, Mother and stepfather began looking for him; that Mother and stepfather returned home to find the Philadelphia Police at their home with the family's dog and cat; that the Child was transported to the Special Victims Unit (SVU); and that Mother and stepfather went to the SVU, but were informed that the Child was not at SVU and that the Child had been taken to the hospital. The Report also alleged that St. Christopher's Hospital for Children had admitted the Child on social admittance; that Mother stated that the only family resource available for the Child was his Maternal Great-Aunt, who lived two hours away; that Mother believed that Maternal

5

Grandmother, M.K. had been telling the Child to make false accusations against herself and the stepfather; that the sexual abuse allegation had been investigated in Florida five years prior and was unfounded; and that she did not understand why sexual abuse allegations had been made again. The Report is under investigation. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "h").

On August 14, 2016, DHS visited St. Christopher's Hospital for Children and met with the Child. He stated to DHS that he had been thrown down the steps by his Mother and that his stepfather had touched him in an inappropriate manner. He showed DHS scrapes on both of his knees; he stated to DHS that Mother and stepfather fed him old food; that Mother and stepfather mistreated him; and that he wanted to return to Florida to live with his Maternal Grandmother, M.K. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "i").

On August 14, 2016, the Child received a forensic interview at PCA. He disclosed that when he was three or four years old, his stepfather had touched him in an inappropriate sexual manner; that recently, his stepfather had touched him in an inappropriate sexual manner; that he had been thrown down the stairs by Mother and stepfather; and that he was hit with a paddle by Mother. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "j").

On August 14, 2016, DHS visited the family's home and met with Mother and stepfather to discuss the allegations of the GPS, CPS, and Supplemental Reports. Mother admitted to DHS that on August 11, 2016, she had used poor judgment when she decided to leave the Child and his younger siblings inside the car alone while she shopped at Wal-Mart. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "k").

6

DHS stated to Mother that during DHS' investigation of the GPS, CPS, and Supplemental Reports, that the Child would not be able to return to the family's home. DHS informed Mother and stepfather that Maternal Grandmother, M.K., would be traveling to Philadelphia to make herself available as a resource for the Child. Mother stated she did not want the Child placed in the care of M.K., as she believed M.K. had coached Gabriel to make false accusations against herself and stepfather. Mother also stated that she preferred the Child be placed in general foster care as opposed to being placed in the care of Maternal Grandmother, M.K. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "l").

DHS observed the other Children in the home. The Children appeared healthy and well cared for. Stepfather is the father of these two younger Children. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "m").

On August 14, 2016, DHS obtained an OPC for the Child and he was placed in foster care through A Second Chance, Inc. (DHS-Dependency Petition, filed 8/19/2016, ¶5 "n").

A Shelter Care Hearing was held on August 17, 2016, before the Honorable Allan L. Tereshko. Legal custody of the Child shall remain with DHS, and placement shall remain in Foster Care. Mother is not to have visits until further order of the Court. A forensic interview through PCA is currently being conducted. Maternal Grandmother, M.K., from Florida has expressed an interest in caring for the Child. OPC is lifted and temporary commitment stands. (Shelter Care Order, 8/17/2017).

7

On September 7, 2016, a hearing was held before the Honorable Allan L. Tereshko. Child was adjudicated Dependent, and legal custody of the Child shall transfer to DHS. Placement of the Child is in Foster Care. Mother, biological Father, E.F., and Maternal Grandmother, M.K., are to have supervised visits, and supervised telephone contact to be supervised by foster parent. Mother is referred to BHS for consultation/evaluation. Child is referred to BHS for consultation/evaluation if necessary. DHS/CUA to initiate ICPC for Maternal Grandmother in Florida. DHS to explore Father, E.F., as potential resource. Family therapy will be implemented when appropriate. (Order of Adjudication and Disposition, 9/07/2016).

On October 6, 2016, Maternal Grandmother filed an Emergency Petition for Review Hearing to Close Dependency Case in Family Court of Philadelphia County Juvenile Division. (Exhibit MGM-#2).

On October 11, 2016, a Rule to Show Cause was signed by the Honorable Allan L. Tereshko, and set a hearing for October 19, 2016. (Rule to Show Cause, 10/11/2016).

On October 19, 2016, the Honorable Allan L. Tereshko continued this matter to 11/02/2016. Legal custody of the Child shall remain with DHS, and placement shall remain in Foster Care through Wordsworth. Maternal Grandmother, M.K.'s Motion to Intervene Granted. DHS to explore Maternal Great Aunt, S.G., who resides at 2750 Blackrock Rd., Hanover, PA 17331, as possible placement/kinship resource. Child Advocate is to provide copies of Maternal Great Aunt's home evaluation within 24 hours. Child may be moved to Maternal Great Aunt's home if DHS and Child Advocate agree. (Continuance Order, 10/19/2016).

A continuance was granted by the Honorable Richard J. Gordon on November 2, 2016. Mother's counsel unavailable. Child to remain as committed. (Continuance Order, 11/02/2016).

A Permanency Review Hearing was held on December 6, 2016, before the Honorable Jonathan Q. Irvine. Legal custody of the Child remains with DHS. Placement of the Child to remain in Foster Care, remain as committed. (Permanency Review Order, 12/06/2016).

A Contested Permanency Review Hearing was held on December 8, 2016 before the Honorable Jonathan Q. Irvine. Time constraint required a continuance to 1/05/2017. Legal custody of the Child remains with DHS. Placement of the Child to remain in Foster Care, remain as committed. Mother, and Maternal Grandmother, M.K., are to have weekly supervised visits at the Agency. Mother is attending ARC for parenting. Mother completed parenting café, and attending weekly visits. CUA has made outreach to Father in New York. Father is open to assessment of his home. ICPC was initiated with Maternal Grandmother in Florida. Maternal Great Aunt is possible kinship resource, and resides in Hanover, PA. Home is appropriate. Child referred to BHS for consultation/evaluation for individual and trauma based therapy. (Permanency Review Order, 12/08/2016).

A Status Hearing was held on January 5, 2017, before the Honorable Allan L. Tereshko. Legal custody of the Child remains with DHS, and placement of the Child to remain in Foster Care. Mother, and Maternal Grandmother, M.K., continue with weekly supervised visits at the Agency. Foster parent, M.S., is putting in 30 day notice today, and is to release all of the Child's belongings to DHA/CUA. Mother is attending ARC

9

for parenting. Child referred to BHS for consultation/evaluation for individual and trauma based therapy. Child Advocate shall accompany DHS to assess Mother's home. Case continued for further testimony. (Status Review Order, 1/05/2017).

On March 2, 2017, a Judges' UCCJEA Conference was held by the Honorable Catherine L. Combee, Circuit Court Judge, Tenth Judicial Circuit for Highlands County Florida. The Honorable Judge Allan L. Tereshko participated in the telephone conference. Present on the call were: Maternal Grandmother, M.K., with counsel, Dana F. Ingham, Maternal Step-Grandfather, A.K., with counsel in Florida, Arthur C. Fulmer, Jr.; Mother, with counsel Angelina Dagher; Father, E.F., did not appear, however court-appointed counsel, William T. Rice, appeared on his behalf; G.K., the minor Child, with his Child Advocate, Angela C. Brosnan; DHS attorney, Bridget Warner; Andrea Kerr, counsel for the Florida Department of Children & Families (DCF); and Maternal Great Aunt, S.G. All parties agreed:

A. Florida will not exercise jurisdiction over this matter;

B. The case will proceed as a custody matter in Pennsylvania and the state has accepted jurisdiction of this matter pursuant to its and Florida's UCCJEA;

C. The Court will hereby DISMISS Petitioner's Petition for Temporary Custody of Extended Family. (Order of Hon. Catherine L. Combee, 4/6/2017 re Judges' UCCJEA Conference held 3/2/2017. (Order 4/6/2017).

A Contested Permanency Review Hearing was also held on March 2, 2017 before the Honorable Allan L. Tereshko. Placement of the Child is no longer necessary, in that the Court grants Temporary Legal/Physical Custody of the Child to Maternal Great Aunt,

10

S.G. Mother and Maternal Grandmother's visitation to stand. (Permanency Review Order, 3/02/2017).

On March 30, 2017, a Custody Order was filed in the Court of Common Pleas of Philadelphia County-Family Court Division, Custody Case ID: 0C1700611. The Honorable Allan L. Tereshko: In the Interest of Gabriel Kennedy, Custody Decree: Melinda Kennedy at 4632 Starfish Ave., Sebring, FLA 33870, is awarded permanent legal and physical custody of the above named Child. (Custody Order, 0C1700611, 3/30/2017).

On May 1, 2017, attorney Emily Cherniak filed a <u>Petition to Modify Custody</u> on behalf of Mother, Christina Matos-Kennedy. A hearing is scheduled for 6/21/2017. (First Judicial District of PA-Docket Report).

On April 6, 2017, a Court Order from the Circuit Court of the Tenth Judicial Circuit in and for Highlands County, Florida Case No. FC16-805, Division 12 was filed in Philadelphia Court of Common Pleas-Family Court Division, Custody Docket # 0C1700611. (Order of Judges' UCCJEA Conference, 04/06/2017).

## HEARINGS

This Court held a telephonic UCCJEA[1] conference hearing on March 2, 2017. The Honorable Catherine L. Combee, Circuit Court Judge of the Tenth Circuit in and for

---

[1] 23 Pa.C.S.A.§5421-Uniform Child Custody Jurisdiction and Enforcement Act "UCCJEA," is intended to avoid jurisdictional competition, promote cooperation between courts, deter abduction of children, avoid relitigation of custody decisions of other states, and facilitate the enforcement of custody orders of other states.

11

Highlands County Florida was present by telephone. Ms. Kerr, Department of Children and Family in Florida, was present by telephone. Arthur Fulmer, attorney for maternal grandparents in Florida, was present by telephone. Mother was present in the courtroom, with counsel, Angelina Dagher. Maternal Grandmother, M. K., was not present, however she was represented by counsel, Dana Ingram. Angela Brosnan, the Child Advocate, was present in the courtroom. Bridget Warner, attorney for DHS, was present in the courtroom, and attorney William Rice, was present in the courtroom on behalf of father, E.F. (N.T., 3/02/2017, p.13 at 6-25; p.14 at 1-25; p.15, 1-25; p.16 at 1-16).

After much discussion, all parties were in agreement that they would prefer or would like the case to be heard on the matter in Pennsylvania. Judge Combee agreed to release jurisdiction and allow Pennsylvania to accept it. She stated, "Based on our Statute 751, I would not have jurisdiction to proceed under temporary custody." This Court responded, "Very well. Thank you very much. I'm going to close the call now, and I'll take the necessary steps to resolve the open dependency action, and then set this matter for a full custody hearing, based upon the grandparents' Petition, in the first opening I have available. I'm going to terminate this call now. Thank you very much." (N.T., 3/02/2017 p.15 at 17-25; p.16 at 1-25; p.24 at 19-21; p.26 at 4-18).

This Court then proceeded with the Permanency Review Hearing. Angela Brosnan noted to the Court that the current foster parent has put in a 30-day notice and then rescinded, upon the understanding that the Child would be placed in a different home as of this Court date. The Child had burned the foster brother, attempted to burn down the foster home, was referred for a partial program, but has yet to find one that has openings for him immediately. The Child had absconded from school several times and

12

broken into the previous foster parent's home and the police had to go out and escort him back to school. She opined that it appears general foster care is not well-suited for this Child and he is on the verge of having to be an inpatient at a hospital. She recommended the Child be moved to live with family, his Maternal Aunt, S.G. (N.T., 3/02/2017 at p.32 at 3-25).

The Child, G.K., 9 ½ years old at the time, was called as the first witness. Ms. Brosnan, the Child Advocate, asked the Child where he wanted to live, and he responded he wanted to live with his grandmother, however, if he could not then he would like to live with his aunt, Sherry. He further stated he did not want to live with his Mother. (N.T., 3/02/2017 p.41 at 15-25; p.42 at 1-21).

The Child further stated that he liked living with his brothers and sisters, however he did not like living with his Mother. He stated he does not like the school he was attending because the other kids kept hitting him and he hit them back. The Child testified J.M. lives with Mother and referred to him as her boyfriend. He stated he was scared of him because he was hitting him and touching him in a bad way. (N.T., 3/02/2017 p.44 at 9-25; p.46 at 8-25; p.47 at 1-10).

At the conclusion of the testimony, this Court issued a Permanency Review Order granting temporary legal and physical custody of the Child to Maternal Aunt, S.G. The Court reasoned, "based on the evidence, that the current foster placement is not in the best interest of the Child and the Child should be placed with the Maternal Aunt, without subsidy. And the opportunity to reunite the Child with a family member presents itself, and the Court should take advantage of it. We have established March 30th as a date for the custody hearing on the grandparents' petition for custody." The next hearing

was scheduled for March 30, 2017. (Permanency Review Order, 3/02/2017) (N.T., 3/02/2017 p.51 at 5-25).

This Court held a hearing on March 30, 2017. Mother was present, represented by Counsel, Angelina Dagher. Maternal Grandmother, M.K., was present, and represented by counsel, Dana Ingham. Maternal Great Aunt, S.G., was also present.

Counsel for DHS, Bridget Warner, began by noting that DHS did not have standing in the Custody matter before the Court and did not wish to participate. DHS' position is that the Dependency issues have been resolved, and recommended the Dependency matter be discharged and that it continue as a Custody matter. The allegations were unfounded and testimony was put on in the Dependency matter already from DHS and CUA concerning no dependency issues in Mother's home and the conclusion of DHS' investigation into all of those allegations. (N.T., 3/30/2017, p.4 at 8-20; p.6 at 5-11).

The Court discharged the Dependency petition and proceeded on the Custody matter which was filed on October 6, 2016 as an Emergency Petition for Special Relief: Review Hearing to Close Dependency Case. This Court held a telephone conference with the Florida judge on March 2, 2017, and the Florida Court deferred to this Court to hear the custody matter. The Court noted the, "merits of the custody action are outlined in the original Florida petition, which this Court now has jurisdiction to entertain under the UCCJA." (N.T., 3/30/2017 p.6 at 12-25; p.7 at 1-5; p.12 at 1-7, 22-25; p. 13 at 1-2).

This Court provided copies of the original Petition for Temporary Custody of Extended Family, "that's the way it's titled anyway, but it's considered to be a Petition

14

for Custody by extended family which is filed originally in the Circuit Court of the Tenth Judicial District and then for Highlands County Florida, the date of the filing of that petition was 8/18/2016." (N.T., 3/30/2017, p.16 at 14-25).

The first witness to testify in the Custody proceeding was Maternal Grandmother, M.K. Her attorney, Dana Ingham, conducted the direct examination. She testified her grandson, G.K., was born on September 16, 2007, and that the Child's Mother, her daughter, was living with her at that time. Both Mother and Child were released from the hospital and continued to live with Maternal Grandmother, until Mother moved to an apartment the first week of January 2008, when Maternal Grandmother and her husband obtained an apartment for her in Sunny Lake, Florida. She testified Mother never took the Child to live with her in that apartment and the Child continued to live with her since his birth. (N.T., 3/30/2017, p.17 at 7-25; p.18 at 1-16).

Maternal Grandmother, further testified Mother met her current husband, J. M., shortly after the birth of the Child, married him in May 2011, and she lived with him there in Florida until he moved to Philadelphia. She joined him in Philadelphia in March 2016. (N.T., 3/30/2017, p.18 at 1-25; p.19 at 1-14).

Maternal Grandmother, stated Mother never took the Child for an overnight visit during any of the time the Child lived with his Grandmother. In 2015, Mother expressed a desire for the Child to spend weekends with her and her husband, however the Child expressed he did not want to go, so the visits never happened. Mother decided not to force the Child to go with her. (N.T., 3/30/2017, p.21 at 7-22).

Maternal Grandmother continued her testimony and stated that on July 6, 2016, Mother showed up at her house and stated she was taking the Child with her to

15

Philadelphia. Mother told her that she was taking him for a few weeks and she would have him back before school started, which was August 12, 2016. (N.T., 3/30/2017, p. 22 at 7-25; p.23 at 1-10).

Maternal Grandmother testified the Child has always referred to her and her husband as mom and dad, and has always referred to his Mother as Tina. She and her husband have been the primary caretakers of the Child his whole life, and noted that she placed the Child in preschool when he was three and later he started baseball and he has been playing baseball ever since. She noted her grandson needed extra help with his reading, and she had a tutor help him and they would go to the library twice a week. Maternal Grandmother testified her and her husband provided for all of the Child's needs, since birth, and they treat him as if he is their own child. (N.T., 3/30/2017, p. 24 at 1-12; p.25 at 1-25; p.26 at 1-22; p.28 at 19-24).

Maternal Grandmother testified the Child has been in the same school district his entire life and his school grades were generally good. However, he did struggle a bit with comprehension and reading, but she and her husband have provided tutoring for him at times. She stated the child did not have behavioral issues at school and had lots of friends. Mother never provided support nor did she give any money toward the Child's equipment for extra-curricular activities nor for school supplies or school pictures. She attended the parent/teacher conferences at school and is the Child's contact for any issues or emergencies. Mother has not been involved with the school. (N.T., 3/30/2017, p.30 at 3-25; p.31 at 31 at 1-13).

Maternal Grandmother stated that if she is granted custody of her grandson, she would like for him to continue at his current school until the term is over because he likes

16

his school very much and he is doing very well. He is with her sister, S.G., in Hanover, Pennsylvania, and attends school there. She stated she is willing to accept the responsibility for his education, health, medical, and counseling or any other requirement of the Court. She concluded that she has been doing that since he was born. (N.T., 3/30/2017, p.32 at 1-23; p.34 1-8).

Maternal Grandmother then presented a notarized Affidavit executed July 6, 2010, in the Circuit Court of the Tenth Judicial Circuit, Highlands County, Florida, Juvenile Division. (Exhibit MGM-1). This Affidavit was signed by Mother giving permission for Maternal Grandmother to provide temporary care for the Child, including taking care of him, providing health care, and enrolling him in school. She noted that this document has never been revoked. This document was admitted as evidence during the Custody proceeding. (N.T., 3/30/2017 p.41 at 10-12).

Also presented and admitted as evidence, was the Petition for Temporary Custody by Extended Family filed in the Circuit Court of the Tenth Judicial Circuit in Highlands County, Florida, on or about August 18, 2016 by Maternal Grandmother. (Exhibit MGM-3).

Maternal Grandmother expressed safety concerns with the Child if he was to be in the custody of his Mother and subjected to contact with the stepfather, J.M., who she suspected of inappropriate sexual contact with her grandson. She related a conversation she had with the Child when he was four years old in 2011, and he described to her how his stepfather had touched him and that he was scared of him. She took the Child to a pediatrician, Dr. Montanez, and he advised her to report it to DCF in Florida. She

17

remains concerned her grandson is at risk if he is in the presence of the stepfather. (N.T., 3/30//2017 p.46 at 1-14; p.47 at 4-25; p.48 at 1-25; p.49 at 1-25; p.51 at 17-22).

Maternal Grandmother stated she would always encourage her grandson to have a relationship with his Mother and she would encourage it. However, the Child knows her and her husband as his parents who provide for his safety, comfort and all his needs. Therefore, they would be the best persons to have custody of the Child. (N.T., 3/30//2017, p.53 at 5-25).

Under cross-examination by Mother, Maternal Grandmother explained that she had witnessed domestic violence between Mother and stepfather and that Mother had confided in her various times that her husband had physically harmed her. (N.T., 3/30//2017, p.56 at 12-25).

Marnie Stone, the Child Advocate Social Worker, was the next person to testify. She noted the Child became involved in the dependency system because of allegations of sexual abuse by stepfather and a GPS Report of the Child running away. (N.T., 3/30//2017, p.62 at 5-25; p.63 at 1-9).

Ms. Stone testified that Mother requested that the Child be placed in foster care rather than with a family member, Maternal Aunt, who lived in Hanover, PA. She established a close relationship with the Child and visited him approximately six times beginning on August 24, 2016 at the foster home and saw him five other times, plus had two telephone conversations with him. (N.T., 3/30//2017, p.66 at 1-25).

Ms. Stone stated the Child expressed to her numerous times that he would like to go back to Florida and live with his Grandmother. She further noted, the Child stated he would run away again if he was placed with Mother, however, he would never run away

18

from his Grandmother. Ms. Stone opined that it would be in the best interest of the Child if he returned to Florida to live with his Grandmother. (N.T., 3/30//2017, p.67 at 1-25).

Ms. Stone also presented a letter from the Child dated February 28, 2017. The Child expressed being afraid to go back to "Tina, real mom." He also stated he wanted to go back to his "mommy", how he describes his Grandmother. She described to the Court the difference in the Child's demeanor from when he was in foster care, disturbing behavior, using foul language, fighting in school and setting fires in the foster home; compared to his behavior in the Maternal Aunt's home in Hanover, PA, where he was happy and snow-boarding. She opined that moving the Child from the foster home to the home of Maternal Aunt was in the Child's best interest. She also stated he is on target academically and he is now an average student. (N.T., 3/30//2017, p.70 at 7-25; p.71 at 7-25; p.72 at 3-17; p.75 at 1-10).

Khayree Connors McChristen, the CUA Case Manager, was the next witness to testify. He stated he was assigned the case on January 27, 2017 and he reviewed the file going back to August 17, 2016, when the Child came into Shelter Care. He testified the Child expressed a desire to live with his Grandmother. (N.T., 3/30//2017, p.77 at 6-11; p.78 at 1-14; p.81 at 7-9).

Mother was the last witness to testify. She stated she lived with her mother, M.K. from the time the Child was born until she married her husband in December 2011. She and her husband moved to Philadelphia and took the Child with her. After approximately one month, they all returned to Sebring, Florida. She then stated she agreed to the Child returning to live with Grandmother, until she took him out of Grandmother's house in the summer of 2016. (N.T., 3/30//2017, p.83 at 1-25; p.85 at 1-10).

19

Mother stated the allegations of sexual and physical abuse started in 2009 and have continued to the present. She states it is untrue and that grandmother uses the Child to make these allegations because she does not care for her husband. (N.T., 3/30//2017, p.86 at 1-25; p.87 at 14-25).

On cross-examination by Angela Brosnan, Child Advocate, Mother admitted she had left her Children unattended in a car while she shopped, however, she stated the car's engine was running with the air conditioner on and the Children were not in a hot car. (N.T., 3/30//2017, p.90 at 7-23).

On cross-examination by Dana Ingham, counsel for Grandmother, Mother stated she preferred her Child be with foster parents than with her Maternal Aunt because she is also very manipulative, just like Grandmother. (N.T., 3/30//2017, p.102 at 24-25; & p.103 at 1-13; p.104 at 17-21).

Finally, Ms. Ingham questioned Mother regarding a Court ordered Evaluation of the Child that occurred on January 10, 2017. The Child was diagnosed with adjustment disorder with mixed disturbance of emotion and conduct post-traumatic stress disorder, suspected victim of sexual abuse, and suspected victim of physical abuse. Mother was unaware of the Evaluation. Mother admitted she had involvement with Children and Youth Services in Florida and in Pennsylvania. (N.T., 3/30//2017, p.109 at 19-25; & p.110 at 1-15).

## LEGAL ANALYSIS

This case began in Philadelphia on August 11, 2016, when DHS received a GPS Report alleging the Child and his siblings were found unattended in a car in a store

20

parking lot. Mother was shopping inside the store and appeared after police arrived. Two days later, on August 13, 2016, the Child was found wandering the streets of Philadelphia asking strangers how to get to Florida to be with his Grandmother. At this time the Child alleged sexual abuse by stepfather and physical abuse by Mother. A Shelter Care Hearing was held on August 17, 2016, and the Child was removed from Mother's care. Thereafter, Maternal Grandmother filed a Petition in Florida on August 18, 2016, seeking to have her grandson returned to her care. The Child was Adjudicated Dependent on September 7, 2016, and remained in foster care until March 30, 2017 when the Court terminated supervision and held a custody hearing.

### A. The Trial Court Properly Terminated the Court Supervision of the Child Pursuant to Pa.R.J.C.P. No. 1631 (A) (2), (5) & (6)[2]

Upon review of a child dependency case, it is the Superior Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record; nevertheless, the Superior Court accords great weight to the trial court's fact-finding function because the trial court is in the best position to observe and rule on the credibility of the parties and witnesses. In re W.M., 2012 PA Super 77, 41 A.3d 618 (2012).

---

[2] **Rule 1631. Termination of Court Supervision. A. Concluding Supervision.** Any party, or the court on its own motion, may move for the termination of supervision when court-ordered services from the county agency are no longer needed and: (2) the child has been reunified with the guardian and the and the circumstances which necessitated the dependency adjudication have been alleviated; (5) the child has been placed in the custody of a permanent legal custodian and services from the county agency are no longer needed; and (6) the child has been placed in the physical and legal custody of a fit and willing relative and services from the county agency are no longer needed.

Mother alleges on Appeal that the Court erred in discharging the Dependency Petition. This Court disagrees.

On March 2, 2017, this Court held a hearing and Angela Brosnan, the Child Advocate, informed the Court that the Child was not doing well in foster care. The Child had burned the foster brother, attempted to burn down the foster home. The Child had absconded from school several times and broken into the previous foster parent's home and the police had to go out and escort him back to school. She opined that it appears general foster care is not well-suited for this Child. She recommended the Child be moved to live with family, his Maternal Aunt, S.G. (N.T., 3/02/2017, at p.32 at 3-25).

The Court also heard testimony from the Child and ordered the Child be moved to reside with Maternal Aunt, S.G. The Court Ordered Temporary Legal and Physical Custody to S.G. Mother and Maternal Grandmother were to continue visitation.

Also on March 2, 2017, this Court held a telephone conference with the Florida Judge based on the petition maternal grandmother had filed on August 18, 2016. The Florida Court deferred to this Court to hear the custody matter. The Court noted the "merits of the custody action are outlined in the original Florida Petition, which this Court now has jurisdiction to entertain under the UCCJA." (N.T., 3/30/2017, p.6 at 12-25; p.7 at 1-5; p.12 at 1-7, 22-25; p.13 at 1-2).

At the next hearing held on March 30, 2017, Bridget Warner, Assistant City Solicitor and attorney for DHS began by noting on the record that the Dependency issues had resolved, and recommended the Court discharge the Dependency matter and that the matter continue as a Custody matter. The Child at this time was in the care of Maternal Aunt in Hanover, PA. (N.T., 3/30//2017, p.4 at 6-20).

22

This Court agreed with DHS' recommendation and proceeded to find no further Dependency issues, no safety concerns, and discharged the Dependency Petition. The Court terminated court supervision of the Child. The Court ruled that the Child is to remain with the Maternal Aunt until Child is able to move with the Maternal Grandmother, M.K., to Florida. Permanent legal and physical custody to M.K., 4632 Starfish Ave., Sebring FL. 3380. (Order for Termination of Court Supervision, 3/30/2017).

The Court reasoned that "the case involves the interaction between the Adoption Act and the Custody Act and we have the benefit of a well written Opinion by the Supreme Court on the issue of this. Therefore, I am finding that there is no Dependency and the Dependency Petition is discharged. And there was no standing, therefore, on behalf of the Department of Human Services at this point in time based upon the discharge of the Dependency action. That remains after the conversation with the Court in Florida, which was the originating jurisdiction of the Custody action, the Court deferred to this Court to hear the Custody matter, and that is what I will be doing today." (N.T., 3/30//2017, p.6 at 13-25; p.7 at 1-5).

### B. The Trial Court Properly Found the Maternal Grandmother had Standing for Legal and Physical Custody Pursuant to 23 Pa.C.S.A. §5324 (2) & (3)(iii)(C) & §5325[3]

---

[3] **23 Pa.C.S.A. §5324. Standing for any form of physical custody or legal custody.** The following individuals may file an action under this chapter for any form of physical or legal custody: (1) A parent of the child. (2) A person who stands in loco parentis to the child. (3) A grandparent of the child who is not in loco parentis of the child: (i) whose relationship with the child began either with the consent of the parent of the child or under a court order; (ii) who assumes or is willing to assume responsibility for the child; and (iii) when one of the following conditions is met: (A) the child has been determined to be a dependent child under 42 Pa.C.S.Ch. 63 (relating to juvenile matters); (B) the child is substantially at risk to due to parental abuse, neglect, drug or alcohol abuse or incapacity; or (C) the child has for a period of at least 12 consecutive months resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23

Under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), a court's decision to exercise or decline jurisdiction is subject to an abuse of discretion standard of review and will not be disturbed absent an abuse of that discretion; an "abuse of discretion" occurs when the court has overridden or misapplied the law, when its judgment is manifestly unreasonable, or when there is insufficient evidence of record to support the court's findings. **Wagner v. Wagner**, 887 A.2d 282, Super.2005. 23 Pa. Stat. and Cons. Stat. Ann. § 5421 (West).

Standing based on *in loco parentis* will be found in a Custody action where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. S.A. v. C.G.R., 856 A.2d 1248, Super.2004, appeal denied 877 A.2d 459, 583 Pa. 678.

Next, Mother alleges the trial court erred by granting standing to the Maternal Grandmother in the custody matter where she did not have standing pursuant to Pennsylvania law to be a party to the dependency or custody proceeding before the Court and Maternal Grandmother did not file a Petition for Custody in Philadelphia County.

Based on the evidence presented, this Court found clear and convincing evidence that Maternal Grandmother has standing for legal and physical custody. Maternal

---

**23 Pa.C.S.A. §5325. Standing for partial physical custody and supervised physical custody.** In addition to situations set forth in section 5324 (relating to any form of physical custody or legal custody), grandparents and great-grandparents may file an action under this chapter for partial physical custody or supervised physical custody in the following situations: (1) where the parents of the child is deceased, a parent or grandparent of the deceased parent may file an action under this section; (2) where the parents of the child have been separated for a period of at least six months or have commenced and continued a proceeding to dissolve their marriage; or (3) when the child has, for a period of at least 12 consecutive months resided with the grandparent or great-grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, an action must be filed within six months after the removal of the child from the home.

Grandmother has cared for and nurtured the Child since his birth. During the testimony at the hearing on March 30, 2017, Mother never refuted this assertion and admitted her son lived with Maternal Grandmother all of his life and wanted to continue to live with her in Florida.

Testimony was given that both Mother and Child lived with Grandmother, however, then Mother married in 2011 and moved out deciding to leave the Child with Grandmother. Maternal Grandmother presented a notarized *Affidavit* executed July 6, 2010, in the Circuit Court of the Tenth Judicial Circuit, Highlands County, Florida, Juvenile Division, which was signed by Mother giving permission for Maternal Grandmother to provide temporary care for the Child, including taking care of him, providing health care, and enrolling him in school. Grandmother testified she kept the Child with her, she was known in his school as the, "Mother" and she and her husband provided all of the financial and emotional care for the Child until Mother removed the Child from her care in July 2016.

The record shows that Grandmother filed a Petition for Temporary Custody by Extended Family, filed in the Circuit Court of the Tenth Judicial Circuit in Highlands County, Florida, on or about August 18, 2016, shortly after the Child was placed in foster care in Philadelphia and approximately one month after he was removed from her home by Mother. The evidence is clear that Maternal Grandmother filed a Petition within six months of the removal of the Child from her home.

## C. Trial Court Properly Awarded Legal and Physical Custody of the Child to the Maternal Grandmother Pursuant to 23 Pa.C.S.A. §5327(b) & §5328 (a) & (c) (1) & (2) & (d).[4]

In any action regarding the custody of the Child between a parent of the Child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence. 23 Pa.C.S.A. §5327(b).

The Custody Act requires only that the trial court articulate the reasons for its custody decision in open court or in a written opinion or order taking into consideration

---

[4] **23 Pa.C.S.A. §5328. Factors to consider when awarding custody. (a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following: (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party. (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child. (2.1) The information set forth in section 5329.1(a) relating to consideration of child abuse and involvement with protective services). (3) The parental duties performed by each party on behalf of the child. (4) The need for stability and continuity in the child's education, family life and community life. (5) The availability of extended family. (6) The child's sibling relationships. (7) The well-reasoned preference of the child, based on the child's maturity and judgment. (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm. (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. (11) The proximity of the residences of the parties. (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements. (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A Party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party. (14) The history of drug or alcohol abuse of a party or member of party's household. (15) The mental and physical condition of a party or member of a party's household. (16) Any other relevant factor. **(b) Gender neutral.**—In making a determination under subsection (a), no party shall receive preference based upon gender in any award granted under this chapter. **(c) Grandparents and great-grandparents.**—(1) In ordering partial physical custody or supervised custody to a party who has standing under section 5325 (1) or (2) relating to standing for partial physical custody or supervised physical custody), the court shall consider the following: (i) the amount of personal contact between the child and the party prior to the filing of the action; (ii) whether the award interferes with any parent-child relationship; and (iii) whether the award is in the best interest of the child. (2) In ordering partial physical custody or supervised physical custody to a parent's parent or grandparent who has standing under section 5325(3), the court shall consider whether the award: (i) interferes with any parent-child relationship; and (ii) is in the best interest of the child.

the enumerated factors. 23 Pa.C.S.A.§5328(d), 5328(a)....[T]here is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. **A.V. v. S.T.**, 87 A.3d. 818, 823 (Pa.Super. 2014).

In her Appeal, Mother claims the Court did not properly weigh and place on the record the factors for determining custody pursuant to 23 Pa.C.S.A.§5328(a). The Court disagrees with this assertion and based its findings on all factors outlined as follows:

This Court heard credible, compelling evidence that the presumption that custody shall be awarded to the parent was rebutted by clear and convincing evidence in favor of the Maternal Grandmother, M.K., pursuant to 23 Pa.C.S.A. §5327(b).

This Court also heard credible evidence, pursuant to 23 Pa.C.S.A. §5328(a) factor(1), that Maternal Grandmother, M.K., is more likely to encourage and permit frequent and continuing contact between the Child and the Mother. Maternal Grandmother testified that her daughter is really a good person who has a good heart. She noted that she would always encourage her grandson to have a relationship with his Mother and she would encourage it. However, the Child knows her and her husband as his parents who provide for his safety, comfort and all his needs.

Further, this Court reasoned, pursuant to 23 Pa.C.S.A. §5328(a) factor 2), that returning the Child to Mother would expose the Child to a continued risk of harm, as evidenced by testimony presented regarding the alleged physical abuse by Mother, and alleged sexual abuse by Stepfather, J.M., suffered by this Child. This Court reasoned that Maternal Grandmother can better provide adequate physical safeguards and supervision

27

of the Child. A Court ordered evaluation of the Child dated January 10, 2017, diagnosed the Child with adjustment disorder with mixed disturbance of emotion and conduct post-traumatic stress disorder, suspected victim of sexual abuse, and suspected victim of physical abuse. (N.T., 3/30//2017, p.109 at 19-25; p.110 at 1-15).

The Court heard credible testimony, and reasoned regarding the 23 Pa.C.S.A. §5328(a) factor (3) that Maternal Grandmother had described in detail the parental duties she has performed for the Child. She has done so for his entire life, and continued to do so until he was removed by Mother in July 2016. She performed all parental duties for the Child and provided care, safety and nurturing, as evidenced by credible testimony regarding the Child's school matters and extra-curricular activities, such as baseball. The Child refers to Maternal Grandmother and her husband as Mom and Dad, and has always referred to Mother as Tina. (N.T., 3/30/2017, p.24 at 1-12; p.25 at 1-25; p.26 at 1-22; p.28 at 19-24; p.30 at 3-25; p.31 at 1-13).

Next, pursuant to 23 Pa.C.S.A. §5328(a) factor (4), this Court further reasoned that the need for stability and continuity in the Child's education, family life and community life would be better served if the Child was returned to Maternal Grandmother in Florida. Maternal Grandmother is more likely to maintain a loving, stable, consistent and nurturing relationship with the Child, adequate for the Child's emotional needs.

Pursuant to 23 Pa.C.S.A. §5328(a) factor (5) and factor (6), the Court heard credible and persuasive testimony from Maternal Grandmother regarding the availability of extended family and the Child's sibling relationships. She stated the Child has lived with her and her husband his entire life and has thrived under their care. The Child has

28

established relationships with her family, friends, school mates, and fellow baseball players in Florida. She noted that her sister, Maternal Aunt, lived in Hanover, PA., and was caring for the Child temporarily. The Child's young siblings currently continue to reside with Mother and this Court believes Maternal Grandmother would encourage contact between the Child and his siblings.

Pursuant to 23 Pa.C.S.A. §5328(a) factor (7), this Court heard credible testimony from Marnie Stone, Child Advocate Social Worker, who stated that the Child expressed to her numerous times that he would like to go back to Florida and live with his Maternal Grandmother. She further stated that the Child threatened to run away from Mother if placed with her again, but stated he would never run away from his Grandmother. The Court reasoned the Child was approximately 9 ½ years old at the time and had the maturity and judgment to state his well-reasoned preference of where he would rather live.

Pursuant to 23 Pa.C.S.A. §5328(a) factor (8), this Court heard testimony regarding Mother's attempts to turn the Child against his Grandmother and other relatives. Mother testified that the allegations of sexual and physical abuse by her husband against the Child are untrue and that Grandmother uses the Child to make these allegations because she does not care for her husband. The Court also heard testimony from Mother that she would prefer the Child be with foster parents rather than with maternal aunt because she was manipulative just like Maternal Grandmother. The Court reasoned that the fact that Mother perceived that the Child's most recent placement in a foster home would be in the best interest of the Child compared to either living with her or her Mother supports the fact that Mother's perception of best interest is so warped with

her animosity toward her Mother that she would forego any semblance of best interest of this Child and place the Child in what the Court finds to be a very precarious destructive environment.

Pursuant to 23 Pa.C.S.A. §5328(a) factors (9) and (10), this Court reasoned from credible and persuasive testimony that the reality of this situation is that Maternal Grandmother has been the mother of this Child from the Child's birth. She has provided all of the needs for the Child, all the physical and emotional needs. Evidence was presented that the Child thrived under the loving, stable, consistent and nurturing relationship with his Grandmother. Maternal Grandmother testified the Child was an avid baseball player in Florida and she encouraged and supported this extra after school activity because the Child enjoyed it and was good at playing baseball. The Child was also performing adequately and had acceptable grades. Therefore, this Court reasoned Maternal Grandmother was more likely to maintain a loving, stable, consistent and nurturing relationship with the Child adequate for the Child's emotional needs. Further, this Court reasoned that Maternal Grandmother is more likely to attend to the daily physical, emotional, developmental, educational and special needs of this Child.

Regarding 23 Pa.C.S.A. §5328(a) factor (11), the residences of Mother in Pennsylvania and Maternal Grandmother in Florida, are not in close proximity, however, this Court found Maternal Grandmother to be more reliable and credible and more likely to maintain contact with Mother although they live in different areas in the United States.

Regarding 23 Pa.C.S.A. §5328(a) factor (12), this Court found that Mother used poor judgment when she decided to leave the Child and his siblings in a car alone while she was shopping at Walmart. This is evidence of Mother's inability to make appropriate

30

child care arrangements for her Children. On the other hand, Maternal Grandmother testified she catered to her grandson and accompanied him to various activities, and was always available to care for him at all times.

Regarding 23 Pa.C.S.A. §5328(a) factor (13), this Court heard evidence that Mother has a deep rooted animosity towards Maternal Grandmother. This animosity clouds her judgment and will not allow her to perceive what is really in the best interests of her Child. Mother testified that Maternal Grandmother lied about the allegations of sexual and physical abuse and makes these allegations because she does not care for her husband. This level of conflict is perpetrated by Mother and will not allow her to cooperate with Maternal Grandmother. Maternal Grandmother, on the other hand, stated her goodwill and willingness to help her daughter, and thus the Court reasoned that Maternal Grandmother is more likely to cooperate and extend goodwill towards Mother.

Regarding 23 Pa.C.S.A. §5328(a) factor (14), no evidence was presented regarding a history of drug or alcohol abuse of either party, or a member of a party's household.

Regarding 23 Pa.C.S.A. §5328(a) factor (15), this Court concluded that Mother is seriously disconnected from reality. She is not able to perceive reality because of her deep rooted animosity to her Mother. This inability of Mother to connect with reality would prevent her from any time being able to parent this Child appropriately. The Child's safety has been compromised at many points in time when the Child has been with Mother and Mother's insistence on the Child's independent reporting of certain facts as being a product of manipulation by the Maternal Grandmother is not consistent with the facts. The Court found Maternal Grandmother to be truthful, honest and forthcoming.

31

# CONCLUSION

The Court concluded:

> I have had the benefit to be intimately involved in this case, presiding over the dependency action and have a separate awareness of this case now presiding separately as an independent action over the custody matter. And the evidence offered here, I think, is competent to allow me to render a decision on the custody issue.
>
> As a matter, first order of business is, there are seriously conflicting versions of the events that have occurred in this Child's life. And having the benefit of observing the parties and considering either the consistency and/or inconsistency, the logical connect or disconnect, and the ability of the witnesses to relate events accurately, I find that the Mother is not credible on almost every issue where there's a conflict between the Mother's testimony and the maternal grandmother's testimony.
>
> And having the benefit of observing maternal grandmother, and considering those same factors, I find that the maternal grandmother is credible in all of the issues that she has spoken to.
>
> And the reality is that maternal grandmother has been the mother to this child from the Child's birth, has provided all of the needs for the Child, and has provided all of the physical needs, the emotional needs. And Mother has been content to remain on the periphery of this Child's life, and at times disappearing from the Child's life completely. The physical record establishes certain things that the Mother completely denies occurred. Some of these things are just incontestable, yet Mother continues to view the world through a lens that focuses more on denying the Child his best interests.
>
> The Child has been reaching out since this disastrous foster care placement and been reaching out for the person that he has known, only known as his true caretaker and that is maternal grandmother and her husband.
>
> Therefore, considering the record as a whole, and the testimony that I have been able to observe today, the

32

primary physical and legal custody of the Child, G.K., is ordered to maternal grandmother and she may leave with the Child and return to the home state of Florida at the most next convenient opportunity.

As to the terms of visitation, I'm not able to address that now, and I'll offer the parties an opportunity to work that out, and if they're not able to, you'll have to return to me to resolve the custody or visitation issue recognizing that it will be an interstate custody arrangement based upon my finding that the Child should return with maternal grandmother as soon as possible.

(N.T. 3/30/2017, p.111 at 16-25; p.112 at 1-14,22-25; p.113 at 1-9; p.114 at 9-25; p.115 at 4-12).

For the foregoing reasons, this Court respectfully requests that the Orders of March 30, 2017, terminating Dependency Court supervision of the Child, and awarding Maternal Grandmother, M.K., Legal and Physical Custody of her Grandson, G.K., be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

12-14-17
DATE

33

## CERTIFCATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been served upon the following parties by the manner as designated:

**Family Court Delivery Mail Box**

Emily Beth Cherniak ,Esq.
Law Offices of Jack McMahon
1500 JFK Blvd., Ste. 1010
Philadelphia, PA 19102
Counsel for Appellant, Mother, C.M.K.

William T. Rice, Esq.
1800 JFK Blvd., Ste. 300
Philadelphia, PA 19103
Counsel for Father, E.F.

Bridget Warner, Esq. ACS,
Phila Solicitor's Office
One Parkway, 1515 Arch St, 16th flr.
Philadelphia, PA 19102
DHS Counsel

Angela Brosnan, Esq.
Defender Assoc. of Philadelphia
1441 Sansom St.
Philadelphia, PA 19102
Counsel for Child, G.K.


_____
**ALLAN L. TERESHKO, Sr. J.**

12-14-17
**DATE**